**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**D.B.,**

**Plaintiff,**

**vs.** **1:22-CV-282 (MAD/PJE)**

**ANN MARIE T. SULLIVAN, M.D., et al.,**

**Defendants.**

---

**APPEARANCES:** **OF COUNSEL:**

**THE BELLANTONI LAW FIRM, PLLC** **AMY L. BELLANTONI, ESQ.**
2 Overhill Road
Suite 400
Scarsdale, New York 10583
Attorney for Plaintiff

**OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL** **MARK J. DOLAN, AAG**
The Capitol
Albany, New York 12224
Attorney for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiff D.B. commenced this action on March 23, 2022, bringing claims for violations of his Second, Fourth, and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. Seeking declaratory and injunctive relief, as well as punitive, economic, and compensatory damages, Plaintiff's original complaint alleged that, despite his efforts to recover his rights through state remedies such as an application for a Certificate of Relief from Civil Disabilities Related to Firearms ("certificate of relief") and a subsequent Article 78 proceeding, Defendants

Ann Marie T. Sullivan, M.D, Commissioner of the New York State Office of Mental Health ("OMH") ("Defendant Sullivan"), Rossana Rosado, Commissioner of the Division of Criminal Justice Services, John Does 1-5, and Jane Does 1-5, denied him his constitutional right to purchase a firearm by improperly reporting him to the SAFE Act Database and the National Instant Criminal Background Check System ("NICS"). *See id.*

On March 9, 2023, the Court denied Defendants' motion to dismiss the original complaint. *See* Dkt. No. 18. Thereafter, Plaintiff moved to amend his complaint. *See* Dkt. No. 34. Plaintiff sought to amend his complaint as follows: (1) to add new defendants, Dr. Li-Wen Grace Lee, Carmen Barber, and Tony Trahan, referred to as the "Panel Members" in the original complaint, who were "at least three . . . of the Does referenced in the initial [c]omplaint"; (2) eliminate personal capacity claims against Defendant Sullivan; (3) eliminate the Fourth Amendment failure to train/supervise claims; (4) eliminate the Fourteenth Amendment post-deprivation claim; (5) remove Defendants Division of Criminal Justice Services and Rosanna Rosado; and (6) to "narrow[] the language relating to the claims and declaratory relief and add[] language challenging New York State Mental Hygiene law [("MHL")] 7.09(j)." Dkt. No. 34-3 at 3-5.

On March 19, 2025, the Court denied the motion to amend to the extent Plaintiff (1) sought to add a claim that MHL § 7.09(j) is unconstitutionally overbroad, and (2) proceed with claims against unidentified Does 1-2. *See* Dkt. No. 40 at 10. The motion to amend was granted in all other respects. *See id.* Defendants Rosado, John Does 1-5, Jane Does 1-5, and Sullivan (in her individual capacity) were terminated. *See id.*

Thereafter, Plaintiff filed an amended complaint, alleging claims against Li-Wen Grace Lee, M.D. ("Defendant Lee"), Carmen Barber ("Defendant Barber"), and Tony Trahan ("Defendant Trahan"), in their individual and official capacities (the "Panel Members"), as well as

Defendant Sullivan, in her official capacity. *See* Dkt. No. 41. The amended complaint states claims for violation of the Second Amendment and violation of Fourteenth Amendment pre-deprivation due process, pursuant to § 1983. *See id.* at ¶¶ 131-34. Plaintiff seeks declaratory and injunctive relief, as well as punitive, economic, and compensatory damages. *See id.* at 22-23.

Currently before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 59, 62. As set forth below, Defendants' motion for summary judgment is granted and Plaintiff's cross-motion is denied.

## II. BACKGROUND

### A. Factual Background

On August 25, 2014, Plaintiff returned to the apartment he shared with a college roommate from a visit to his home in Massachusetts. *See* Dkt. No. 59-14 at ¶ 1. Plaintiff and his roommate had an argument. *See id.* After the argument, Plaintiff entered his bedroom "and loaded his shotgun, making a 'racking' sound." *Id.* at ¶ 2.[1] Plaintiff's roommate then exited the apartment "and contacted local police to assist him in removing his belongings since the roommate feared for his safety." *Id.* at ¶ 3. "At the recommendation of the responding officers, Petitioner presented to the crisis unit at Samaritan Hospital." *Id.* at ¶ 4. At Samaritan Hospital, Plaintiff reported that he was experiencing a "mental breakdown" and was involuntarily admitted pursuant to MHL § 9.39. *Id.* at ¶ 5; Dkt. No. 62-1 at ¶ 5.

[1] Plaintiff denies, in whole or in part, paragraphs two, five, and seven of Defendant's Statement of Undisputed Material Facts, filed pursuant to Rule 56.1(a) of the Local Rules of the Northern District of New York. *See* Dkt. No. 62-1 at 4-5. Plaintiff's denials primarily rely upon selective citation to Plaintiff's self-serving statements contained in medical records. *See id.* (citing Dkt. No. 62-6 at 27, 107, 139). The factual background of this case is largely undisputed and the Court has closely reviewed the summary judgment record to ensure all facts stated herein are supported by the record.

As part of Plaintiff's involuntary admission, two physicians from Samaritan Hospital executed forms indicating their belief that Plaintiff met the criteria for MHL § 9.39 admission. *See* Dkt. No. 59-14 at ¶ 6. On August 27, 2014, Plaintiff was discharged. *See id.* at ¶ 7. Plaintiff's discharge paperwork indicated that psychiatric and counseling follow-ups had been scheduled. *See* Dkt. No. 59-10 at 47.

In 2019, Plaintiff attempted to purchase a firearm in Massachusetts, his state of residence. *See* Dkt. No. 59-14 at ¶ 8. However, his "purchase was denied based on a [NICS] background check." *Id.* at ¶ 9. On April 3, 2020, Plaintiff submitted an application to the Office of NICS Appeals, seeking a certificate of relief which would permit removal of his name from the NICS database. *See id.* at ¶ 10.

Defendants Lee, Barber, and Trahan are all Panel Members of the Office of NICS Appeals. *See* Dkt. No. 62-1 at ¶¶ 14-16. The Panel Members reviewed Plaintiff's application, which included hospital records, documents, and supporting material received from Plaintiff. *See id.* at ¶¶ 18-19, 30; Dkt. No. 59-14 at ¶ 11. The Panel Members issued a written determination on December 2, 2020, advising Plaintiff that his application was denied. Dkt. No. 62-1 at ¶ 35; Dkt. No. 59-14 at ¶ 11.

"On April 1, 2021, Plaintiff commenced an Article 78 proceeding in Albany County Supreme [Court] seeking review of the Panel's decision." Dkt. No. 59-14 at ¶ 12. The Supreme Court dismissed Plaintiff's Article 78 petition, "holding that OMH 'did not err in their determination denying the Petitioner's application on the basis that they could not conclude the petitioner would not be likely to act in a manner dangerous to public safety.'" *Id.* at ¶ 13 (quoting Dkt. No. 59-12 at 5). In November 2025, during the pendency of this action, Plaintiff's

reapplication for a certificate of relief was granted by the Panel Members. *See* Dkt. No. 62-1 at ¶ 36.

**B. Statutory and Regulatory Background**

Federal law prohibits certain individuals from buying, owning, or possessing a firearm, *see* 18 U.S.C. § 922(g), and prohibits dealers from selling firearms to such individuals, *see id.* § 922(d). "The Gun Control Act of 1968 created a number of provisions designed 'to deny access to guns and ammunition to . . . defined special risk groups.'" *Phelps v. Bosco*, 711 Fed. Appx. 63, 64 (2d Cir. 2018) (summary order) (quoting Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 152 (1975)). "Among those 'special risk groups' who are not allowed to buy guns and to whom dealers are not allowed sell guns are those who 'ha[ve] been committed to any mental institution.'" *Id.* (citing, *inter alia*, 18 U.S.C. § 922(g)(4)).

Indeed, under 18 U.S.C. § 922(g)(4), it is unlawful for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess or receive firearms or ammunition. Federal regulations define "committed to a mental institution" as:

> A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

27 C.F.R. § 478.11.

"In 1993, to better enable enforcement of its gun control laws, Congress enacted the Brady Handgun Violence Prevention Act ('Brady Act'), which is codified at 18 U.S.C. § 922(t)." *Susman v. Sullivan*, No. 24-CV-1281, 2025 WL 575515, *4 (W.D.N.Y. Feb. 21, 2025) (citing

*Robinson v. Sessions*, 721 Fed. Appx. 20, 21-22 (2d Cir. 2018) (summary order)). "The Brady Act 'require[d] the Attorney General to establish a national instant background[ ]check system by November 30, 1998.'" *Id.* (quoting *Printz v. United States*, 521 U.S. 898, 902 (1997)). "The result was NICS, which refers to the system managed by the FBI . . . that provides information 'on whether receipt of a firearm by a [particular person] . . . would violate [f]ederal or state law.'" *Id.* (quoting 28 C.F.R. § 25.2) (other citation omitted).

"While NICS is a creation of the federal government, it operates with assistance from the states. Indeed, . . . the NICS [database] includes records from both federal and state agencies." *Id.* at *5 (citing 28 C.F.R. § 25.2). "In 2007, Congress passed the NICS Improvement Amendments Act, which aimed to make the federal background check system more comprehensive, including by providing grants to assist states in submitting all relevant records to NICS." *Id.* at *5 (citing NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 122 Stat. 2559) (footnote omitted).

"In response to the NICS Improvement Amendments Act, 'New York State law was amended to allow relevant mental health records to be made accessible to NICS.'" *Id.* (quoting *Montgomery v. Cuomo*, 291 F. Supp. 3d 303, 316 (W.D.N.Y. 2018)). New York's record-sharing statutory provision provides, in relevant part, that:

> The commissioner [of OMH], in cooperation with other applicable state agencies, shall collect, retain or modify data or records, and shall transmit such data or records:
>
> (i) to the division of criminal justice services, or to the criminal justice information services division of the federal bureau of investigation, for the purposes of responding to queries to the [NICS database] regarding attempts to purchase or otherwise take possession of firearms as defined in 18 USC 921(a)(3), in accordance with applicable federal laws or regulations, or

> (ii) to the division of criminal justice services, which may re-disclose such data and records . . . for determining whether a person is no longer permitted under federal or state law to possess a firearm. Such records . . . shall include only names and other non-clinical identifying information *of persons who have been involuntarily committed to a hospital pursuant to article nine of this chapter . . . .*

N.Y. Mental Hyg. Law § 7.09(j)(1) (emphasis added).

The New York Mental Hygiene Law ("MHL" or "Mental Hygiene Law") defines "hospital" as, among other things, "the in-patient services of a psychiatric center under the jurisdiction of [OMH]," "a psychiatric in-patient facility maintained by a political subdivision of the state," "a ward, wing, unit, or other part of a hospital . . . operated as a part of such hospital for the purpose of providing services for the mentally ill," "or other facility providing in-patient care or treatment of the mentally ill . . . ." N.Y. Mental Hyg. Law § 1.03(10). And OMH regulations define "committed to a mental institution" as:

> a formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. Such term includes a commitment to a mental institution involuntarily; commitment for mental defectiveness or mental illness; and commitments for other reasons, such as for drug use, provided, however, that such term does not include a person in a mental institution for observation or a voluntary admission to a mental institution. For purposes of this Part, committed to a mental institution shall include persons who have been involuntarily committed or confined pursuant to article 9 or 10 of the Mental Hygiene Law . . . .

14 N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") § 543.4(b).

Mental Hygiene Law § 9.39[2] ("MHL § 9.39") permits, for a period of fifteen days, the involuntary admission to a hospital with qualifying mental-health services any person with "a mental illness for which immediate observation, care, and treatment in a hospital is appropriate

[2] MHL § 9.39 is a section of article 9 of the Mental Hygiene Law, which is referenced in MHL § 7.09(j)(1) and 14 N.Y.C.R.R. § 543.4.

and which is likely to result in serious harm to themself or others." N.Y. Mental Hyg. Law § 9.39(a). "Like[ly] to result in serious harm" means, in relevant part:

> 1. substantial risk of physical harm to themself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that they are dangerous to themself, or
>
> 2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm . . . .

*Id.* Involuntary admission under MHL § 9.39 is permitted "only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section." *Id.* And to retain such person for longer than forty-eight hours, the first physician's finding must be confirmed by a second physician "who shall be a member of the psychiatric staff of the hospital." *Id.*

As required by the NICS Improvement Amendments Act, New York adopted MHL § 7.09(j)(2), which "sets forth a process for removing a name from the NICS list by seeking a certificate of relief[.]" *Houston v. Nassau Cnty. Police Dep't*, No. 20-CV-5253, 2020 WL 7643132, *3 (E.D.N.Y. Dec. 23, 2020). A certificate of relief may be granted where the Commissioner of OMH or her designee(s) determine that a "person's record and reputation are such that such person will not be likely to act in a manner dangerous to public safety and where the granting of the relief would not be contrary to public safety." N.Y. Mental Hyg. Law § 7.09(j)(2); *see* 14 N.Y.C.R.R. § 543.5.

If the application for a certificate of relief is granted, the psychiatric commitment "is deemed not to have occurred" for the purpose of the federal law disarmament. 34 U.S.C. § 40915(b). And if the application is denied, the applicant can "file a petition with the State court of appropriate jurisdiction for a *de novo* judicial review of the denial." *Id.* § 40915(a)(3). In New

York, the *de novo* judicial review of a denial of a certificate of relief can be accomplished through an Article 78 proceeding. *See Houston*, 2020 WL 7643132, at *3. An aggrieved individual can also resubmit a renewed request for a certificate of relief one year after the denial of a prior request. *See* 14 N.Y.C.R.R. § 543.5(c)(2)(ii).

**C. The Parties' Cross-Motions for Summary Judgment**

Defendants seek summary judgment on the basis that: (1) Plaintiff lacks standing because his injury is not traceable to OMH or the Panel Members; (2) any attempt to relitigate the Panel Members' denial of Plaintiff's application for a certificate of relief is barred by collateral estoppel and the *Rooker-Feldman* doctrine; (3) neither involuntary admission pursuant to MHL § 9.39 nor subsequent placement in the NICS database violate the Second Amendment; (4) Plaintiff was not denied any pre-deprivation due process; (5) Defendants Lee, Barber, and Trahan are entitled to quasi-judicial immunity; and (6) Defendants are entitled to qualified immunity. *See* Dkt. No. 59-15 at 8-30.

Plaintiff cross-moves for summary judgment, arguing (1) the Court should decide the constitutional question raised by Plaintiff before reaching standing or immunity issues; (2) Plaintiff has established Article III standing; (3) Defendants have not met their burden under *Bruen*; (4) hospital admissions pursuant to MHL § 9.39 do not qualify as disqualifying events under "this Nation's historical traditions" or under 18 U.S.C. § 922(g); (5) Defendants violated Plaintiff's Second Amendment rights by refusing to remove him from the NICS database in 2020; (6) the Panel Members are not entitled to quasi-judicial immunity; (7) the Panel Members are not entitled to qualified immunity; and (8) Defendants' *Rooker-Feldman* argument was previously rejected by this Court. Dkt. No. 62-9 at 6-30.

Plaintiff also acknowledges that, during the pendency of this action, his second application for a certificate of relief was granted by the Panel Members. *See id.* at 10 n.4. Thus, because Plaintiff is not a resident of New York State, Plaintiff concedes that his claims for injunctive relief are moot. *See id.* Nevertheless, Plaintiff maintains that his claims for retrospective damages against the Panel Members "remain viable" and contends that two questions remain for this Court to decide: (1) "whether the Panel violated Plaintiff's Second Amendment rights for not summarily removing him from the NICS database when learning that the reported event was simply a short-term hold"; and (2) "whether the Panel's denial of Plaintiff's 2020 application for a [c]ertificate of [r]elief violated his Second Amendment rights." *Id.*

In their opposition to Plaintiff's cross-motion, Defendants agree that "Plaintiff's claims for injunctive relief are now moot[.]" Dkt. No. 65 at 6. According to Defendants, the only remaining claims are Plaintiff's "individual-capacity claims for money damages against the Panel Members who denied his 2020 application for a certificate of relief from disabilities." *Id.*[3] In light of the narrowing of Plaintiff's claims, Defendants contend that they are entitled to summary judgment because (1) Plaintiff lacks standing, as his injury arises from a federal statute and regulation that he has not challenged; (2) the Panel Members are shielded by quasi-judicial immunity because their work is adjudicative in nature; (3) the Panel Members are shielded by qualified immunity because there is no Supreme Court or Second Circuit precedent that would clearly entitle Plaintiff to a certificate of relief; and (4) even if the Court reached the merits of Plaintiff's Second Amendment claim, "laws disarming the mentally ill are fully supported by American legal history and tradition, as are both categorical rules disarming dangerous persons and administrative

---

[3] Neither party squarely addresses whether Plaintiff's requests for declaratory relief are moot in light of the Panel Members granting Plaintiff a certificate of relief in November 2025. As this presents a jurisdictional issue, the Court addresses it below.

processes (like the certificate of relief system) that conduct an individualized assessment of dangerousness before a disqualified person can begin carrying guns again." *Id.*

## III. DISCUSSION

### A. Standard of Review

A court may grant a motion for summary judgment only if it determines "that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (citations omitted). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).

### B. Moot Issues and Abandoned Claims

As discussed, the parties agree that Plaintiff's request for injunctive relief is moot. *See* Dkt. No. 62-9 at 10 n.4; Dkt. No. 65 at 6. Further, Plaintiff appears to admit that only his claims for retrospective damages against the Panel Members remain, but neither he nor Defendants clarify precisely whether the declaratory relief sought is also moot. *See* Dkt. No. 62-9 at 10 n.4; Dkt. No. 65 at 7.

"Under Article III of the U.S. Constitution, '[w]hen a case becomes moot, the federal courts lack subject matter jurisdiction over the action.'" *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (quoting *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994)). To avoid mootness, "throughout the litigation, the plaintiff 'must have suffered, or be

threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)).

From a close analysis of the amended complaint, the Court understands Plaintiff to challenge the following events: (1) that his hospitalization pursuant to MHL § 9.39 was reported to NICS; (2) that Defendants did not notify him that a report was made to NICS or provide him with an opportunity to be heard before the report was made; and (3) that the Panel Members denied his 2020 application for a certificate of relief. *See* Dkt. No. 41 at 22-23. As for remedies, along with monetary relief, Plaintiff requests an order enjoining Defendants from reporting his, and any other, MHL § 9.39 hospitalization to NICS. *See id.* Additionally, Plaintiff seeks orders (1) declaring that it a violation of the Second Amendment for MHL § 9.39 hospitalizations to be reported to NICS because such a hospitalization does not meet the enumerated categories of persons prohibited from possessing or receiving firearms under § 922(g); and (2) declaring that it is a Fourteenth Amendment violation for Defendants to report a MHL § 9.39 hospitalization to NICS without prior notification and an opportunity to be heard. *See id.*

"In certain circumstances it may be possible for a claim of declaratory relief to survive, notwithstanding the mootness of a companion claim for an injunction[.]" *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996). However, "[a] litigant may not use the declaratory judgment statute to secure judicial relief of moot questions." *Christopher P. v. Marcus*, 915 F.2d 794, 802 (2d Cir. 1990). "In determining whether a controversy has become moot, the relevant inquiry is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

warrant the issuance of a declaratory judgment.'" *Id.* (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Here, Plaintiff was granted a certificate of relief in November 2025. "Federal law provides that if a state grants 'an application for relief' under a certificate of relief from disability program 'with respect to an adjudication or a commitment to a mental institution . . . the adjudication or commitment, as the case may be, is deemed not to have occurred for purposes of" § 922(g)(4). *Susman*, 2025 WL 575515, at *12 (quoting 34 U.S.C. § 40915). As such, the controversy regarding Plaintiff's placement in the NICS database based upon his MHL § 9.39 hospitalization is not only without immediacy, but fully resolved.

In other words, to the extent Plaintiff seeks a declaration that Defendants violated his constitutional rights by placing him in (and failing to remove him from) the NICS database, such declaratory relief, if granted, would be without practical implication. *See Browning Debenture Holders' Comm. v. DASA Corp.*, 524 F.2d 811, 817 (2d Cir. 1975) (observing that where "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed"); *Chocho v. Shanahan*, 308 F. Supp. 3d 772, 773 (S.D.N.Y. 2018) ("[C]ourts may not entertain actions for declaratory judgment when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments") (quoting *Velvet Underground v. Andy Warhol Found., for the Visual Arts, Inc.*, 890 F.Supp.2d 398, 403 (S.D.N.Y. 2012)) (internal quotation marks omitted); *Stevens v. Malloy*, No. 3:15-CV-934, 2016 WL 6440112, *6 (D. Conn. Oct. 28, 2016) ("Declaratory relief, prospective in nature, could not possibly redress a past constitutional

violation; rather . . . money damages are the proper remedy for past violations of . . . constitutional rights"). Thus, Plaintiff's requests for declaratory relief are also moot.[4]

Additionally, Plaintiff appears to have abandoned any Fourteenth Amendment claim. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (citation omitted); *see Frantti v. New York*, 414 F. Supp. 3d 257, 291 (N.D.N.Y. 2019). As the Second Circuit has explained, "[g]enerally, . . . a partial response [to a motion for summary judgment] reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others." *Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014). Defendants contend that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment claim because Plaintiff was not denied any pre-deprivation due process rights, *see* Dkt. No. 59-15 at 32-34, but Plaintiff does not reference the Fourteenth Amendment a single time in his cross motion, *see generally* Dkt. No. 62-9. Thus, to extent it is not otherwise moot, the Court deems Plaintiff's Fourteenth Amendment claim abandoned. *See AVA Realty Ithaca, LLC v. Griffin*, 652 F. Supp. 3d 255, 264 (N.D.N.Y. 2023) (finding claim abandoned where opposition to cross-motion for summary judgment contained no reference to argument that such claim should be dismissed).

In sum, as Plaintiff concedes in his cross-motion, the only issue remaining before this Court is whether Plaintiff is entitled to retrospective damages against the Panel Members for their

[4] Relatedly, to the extent Plaintiff seeks a declaratory judgment that it is unconstitutional for Defendants to report other individuals' MHL § 9.39 hospitalizations to NICS, he cannot revive moot claims by invoking the alleged experiences of others. *See In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 58 (2d Cir. 2013) ("A party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'") (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

alleged failure to remove him from the NICS database (either when they "learn[ed] that the reported event was simply a short-term hold" or when they denied Plaintiff's 2020 application for a certificate of relief). Dkt. No. 62-9 at 10, n.4; *see* Dkt. No. 65 at 6 ("The parties do not dispute that Plaintiff's claims for injunctive relief are now moot, leaving only his individual-capacity claims for money damages against the Panel Members who denied his 2020 application for a certificate of relief from disabilities"). Given Plaintiff's express narrowing of the present action and the November 2025 certificate of relief, Plaintiff's claims for injunctive and declaratory relief, including his Fourteenth Amendment claim and any claim against Defendant Sullivan, are dismissed as moot and/or abandoned.[5]

### C. Article III Standing[6]

[5] Even if Plaintiff's injunctive and declaratory relief requests were not moot and/or abandoned, his allegations regarding Defendant Sullivan pertain to the transmission of his MHL § 9.39 hospitalization to NICS pursuant to MHL § 7.09(j) and 14 N.Y.C.R.R. § 543.5. *See* Dkt. No. 41 at ¶¶ 10, 50-53. As this Court recently held in a case with similar claims against Defendant Sullivan, MHL § 7.09(j) is a reporting statute, which simply authorizes the transfer of records to NICS in accordance with federal law, and "'rule 543 merely reiterates that directive.'" *K.I. v. Sullivan*, No. 1:25-CV-264, 2026 WL 571301, *10 (N.D.N.Y. Mar. 2, 2026) (quoting *Susman*, 2025 WL 575515, at *9). Plaintiff's alleged harm, the (now moot) prohibition on his acquisition or possession of firearms, was inflicted by § 922(g)(4), a federal criminal statute that prohibits a person "who has been committed to a mental institution" from "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(4). As in *K.I.*, Plaintiff essentially alleges that, in the absence of state reporting, the federal government would not know that he was disqualified under federal law from possessing or obtaining a firearm. *See K.I.*, 2026 WL 571301, at *9. "But, regardless of whether the State reported Plaintiff's MHL § 9.39 commitment to NICS, Plaintiff [was] prohibited from possessing a firearm under § 922(g)(4)." *Id.* (citing *Susman*, 2025 WL 575515, at *10). Thus, Plaintiff would lack standing to bring his claims against Defendant Sullivan, as his injury was not traceable to her and his injury could not be redressed by an injunction on state reporting of his MHL § 9.39 hospitalization.

[6] Plaintiff asks the Court to decide the merits of his constitutional challenge before reaching an analysis of the standing and immunity issues raised by Defendants. *See* Dkt. No. 62-9 at 13-15. The Court declines; addressing the merits before considering the applicable justiciability and immunity doctrines would be improper. *C.f. Matal v. Tam*, 582 U.S. 218, 230-31 (2017) ("'[The Supreme Court has] often stressed' that it is 'importan[t to] avoi[d] the premature adjudication of

Defendants argue that Plaintiff lacks standing because his injury is neither traceable to OMH or the Panel Members, nor redressable by the relief Plaintiff seeks. *See* Dkt. No. 59-15 at 16-19. In his cross-motion, Plaintiff contends that he "has Article III standing to pursue his Second Amendment claims for retrospective relief against" the Panel Members because the Panel Members are responsible for removing Plaintiff's information from the NICS database. Dkt. No. 62-9 at 16-17.

"Article III, Section 2 of the Constitution limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (citing *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019)). "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (citation and footnote omitted).

The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61).

---

constitutional questions,' . . . and that 'we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable'") (internal citations omitted); *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 382 (S.D.N.Y. 2023) ("Standing is a jurisdictional requirement and must be assessed before reaching the merits") (quoting *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (internal quotation marks omitted); *Richey v. Sullivan*, No. 1:23-CV-344, 2025 WL 1836492, *12-16 (N.D.N.Y. July 3, 2025), *reconsideration denied*, 2025 WL 3022472 (N.D.N.Y. Oct. 29, 2025) ("Since quasi-judicial immunity, like absolute judicial immunity, is an immunity from suit altogether, the Court addresses it first").

"The traceability requirements for Article III standing means that 'the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury.'" *Chevron Corp. v. Donzinger*, 833 F.3d 74, 121 (2d Cir. 2016) (citation omitted). However, the causal nexus that must be demonstrated is something "lower than that of proximate cause." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013). "Such a nexus is most easily shown if there is a direct relationship between the plaintiff and the defendant with respect to the conduct at issue." *Id.* But, "an 'indirect[ ]' relationship between the injury and the challenged conduct does not necessarily mean that the plaintiff lacks standing, although it may make the showing required 'substantially more difficult.'" *Susman*, 2025 WL 575515, at *7 (quoting *Rothstein*, 708 F.3d at 91).

"The third element, called 'redressability,' refers to 'a non-speculative likelihood that the injury can be remedied by the requested relief.'" *Id.* at *8 (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008)). "There is no redressability where such depends on an independent actor who retains 'broad and legitimate discretion [that] the courts cannot presume either to control or to predict.'" *Neary v. Weichert*, 489 F. Supp. 3d 55, 67 (E.D.N.Y. 2020) (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989)).

"As with any other matter on which the plaintiff bears the burden of proof, each element of standing must be supported 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) (quoting *Lujan*, 504 U.S. at 561). At the summary judgment stage, a plaintiff cannot "rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts [establishing standing] . . . which for purposes of the summary judgment motion will be taken to be true." *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 612 F. Supp. 3d 263, 278 (S.D.N.Y. 2020), *aff'd sub nom.*, No. 20-1312-CV, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) (quoting *Lujan*, 504 U.S. at 561).

Here, Plaintiff has demonstrated standing to pursue his individual-capacity "Second Amendment claims for retrospective damages" against the Panel Members. Dkt. No. 62-9 at 17. Plaintiff's remaining claims challenge the Panel Members' refusal to issue him a certificate of relief before November 2025. The injury prong of standing is satisfied, as Defendants do not contest that Plaintiff has suffered an injury in fact. As for the second prong, Plaintiff's alleged injury—his inability to acquire or possess firearms between April 3, 2020 (when Plaintiff initially applied for a certificate of relief) and November 12, 2025 (when the Panel Members granted his second application)—is fairly traceable to the Panel Members' refusal to remove Plaintiff from the NICS database. And the injury is redressable by the monetary relief sought. *See Wang v. Bethlehem Cent. Sch. Dist.*, No. 1:21-CV-1023, 2022 WL 3154142, *5 (N.D.N.Y. Aug. 8, 2022) ("It is well-settled that violations of constitutional rights may be remedied with money damages under Section 1983") (collecting cases).

**D. Quasi-Judicial Immunity**

Defendants argue that the Panel Members are entitled to quasi-judicial immunity because they perform functions that are adjudicatory in nature. *See* Dkt. No. 59-15 at 34-36. Plaintiff contends that the Panel Members are not entitled to quasi-judicial immunity because their functions are "purely administrative in nature." Dkt. No. 62-9 at 31-36.

"[O]fficials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999); *see Mireles v. Waco*, 502 U.S. 9, 11 (1991) ("Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages") (citation omitted). Absolute "judicial immunity is conferred in order to [e]nsure 'that a judicial officer, in exercising the authority vested in him, shall be free to act upon

his own convictions, without apprehension of personal consequences to himself.'" *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)).

The Supreme Court "has extended absolute immunity to certain others" who perform "quasi-judicial" functions. *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 365 (S.D.N.Y. 2011) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985)) (other citation and internal quotation marks omitted). Quasi-judicial immunity entitles the holder "to absolute immunity for acts taken pursuant to their office." *Finn v. Anderson*, 592 Fed. Appx. 16, 18-19 (2d. Cir. 2014) (summary order) (citation omitted).

"The Second Circuit has identified two situations in which this immunity applies." *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 380 (E.D.N.Y. 2009). First, an individual "may be afforded the absolute immunity ordinarily accorded judges acting within the scope of their jurisdictions if his role is functionally comparable to that of a judge." *Mitchell v. Fishbein*, 377 F.3d 157, 172 (2d Cir. 2004) (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)) (internal quotation marks omitted); *see Montero*, 171 F.3d at 760 ("This immunity . . . extends to administrative officials performing functions closely associated with the judicial process because the role of the 'hearing examiner or administrative law judge . . . is "functionally comparable" to that of a judge'") (quoting *Butz*, 438 U.S. at 513).

In "deciding whether an actor is entitled to absolute immunity on the basis that his role is analogous to that of a judge," the Second Circuit "evaluate[s] the challenged proceedings in light of the 'characteristics of the judicial process' set forth in *Butz v. Economou.*" *Mitchell*, 377 F.3d at 172. The characteristics set forth in *Butz* have been reiterated as six non-exhaustive factors: (i) "the need to assure that the individual can perform his functions without harassment or intimidation;" (ii) "the presence of safeguards that reduce the need for private damages actions as

a means of controlling unconstitutional conduct;" (iii) "insulation from political influence;" (iv) "the importance of precedent;" (v) "the adversary nature of the process;" and (vi) "the correctability of error on appeal." *Cleavinger*, 474 U.S. at 202 (citing *Butz*, 438 U.S. at 512); *see Gross v. Rell*, 585 F.3d 72, 80 (2d Cir. 2009), *certified question answered*, 304 Conn. 234, 40 A.3d 240 (2012) (noting the "federal test [for quasi-judicial immunity] involves applying the so-called *Cleavinger* factors").

However, the six factors enumerated in *Cleavinger* are "just a few of the many checks on malicious action by judges." *Butz*, 438 U.S. at 512 (footnote omitted). To ascertain whether an official is entitled to quasi-judicial immunity, courts take "a functional approach and look to the particular acts or responsibilities that the official performed." *King v. Simpson*, 189 F.3d 284, 287-88 (2d Cir. 1999) (citing *Montero*, 171 F.3d at 761). Indeed, the "immunity analysis is 'functional' and scrutinizes the actual responsibilities of the government official in question in light of the six factors." *Tulloch v. Coughlin*, 50 F.3d 114, 116 (2d Cir. 1995) (quoting *Butz*, 438 U.S. at 512).

To accomplish this functional analysis, courts "must conduct '[s]ome factual inquiry' to determine if the duties of the defendants were judicial or prosecutorial, which entitles them to absolute immunity, or administrative, which may entitle them to qualified immunity." *King*, 189 F.3d at 288 (quoting *Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir.1987)). For instance, "a parole board official is absolutely immune from liability for damages when he 'decide[s] to grant, deny, or revoke parole,' because this task is functionally comparable to that of a judge." *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998) (quoting *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir. 1981)). "Absolute immunity flows not from rank or title or location within the

Government, . . . but from the nature of the responsibilities of the individual official." *Cleavinger*, 474 U.S. at 201 (citation and internal quotation marks omitted).

Second, quasi-judicial immunity applies if an individual's "acts are integrally related to an ongoing judicial proceeding." *Mitchell*, 377 F.3d at 172 (citing *Scotto*, 143 F.3d at 111-12) (other citation omitted). For example, the Second Circuit has held that federal probation officers are entitled to absolute immunity for their preparation of presentence reports because, "in preparing presentence reports, a federal probation officer acts as an arm of the court . . . ." *Dorman v. Higgins*, 821 F.2d 133, 137 (2d Cir. 1987). The "more distant a function is from the judicial process, [however,] the less likely absolute immunity will attach." *Scotto*, 143 F.3d at 111 (quoting *Snell v. Tunnell*, 920 F.2d 673, 687 (10th Cir. 1990)).

Defendants contend that the regulations that establish the certificate of relief process, 14 N.Y.C.R.R. §§ 543.1-543.6, describe the role that the Panel Members perform. *See* Dkt. No. 59-15 at 35. Indeed, after taking judicial notice of these regulations, numerous decisions in this District, including from this Court, have found that Defendants Lee, Barber, and Trahan are entitled to absolute quasi-judicial immunity in their function as Panel Members of the ONA. *See Briseno v. Sullivan*, No. 5:25-CV-405, 2026 WL 799655, *8-10 (N.D.N.Y. Mar. 23, 2026); *K.I. v. Sullivan*, No. 1:25-CV-264, 2026 WL 571301, *10-13 (N.D.N.Y. Mar. 2, 2026); *Richey v. Sullivan*, No. 1:23-CV-344, 2025 WL 1836492, *12-16 (N.D.N.Y. July 3, 2025), *reconsideration denied*, 2025 WL 3022472 (N.D.N.Y. Oct. 29, 2025).[7]

---

[7] In March 2025, this Court issued a Memorandum-Decision and Order that, at first glance, could appear to contradict a finding here that the Panel Member are entitled to quasi-judicial immunity. *See* Dkt. No. 40 at 7-8. However, the Court's earlier decision arose under a distinct set of circumstances. At that time, Plaintiff moved for leave to amend his complaint to add, *inter alia*, Defendants Lee, Barber, and Trahan as defendants. *See id.* at 1-2. Magistrate Judge Paul J. Evangelista issued a Report-Recommendation & Order which, in relevant part, recommended that Plaintiff be permitted to amend because "under the facts and circumstances of this case as it is

In the present matter, after careful consideration of the regulations and the benefit of a summary judgment record, the Court comes to the same conclusion: the *Cleavinger* factors, in conjunction with a functional analysis, weigh in favor of granting the Panel Members absolute immunity.

The parties do not dispute that the certificate of relief process is not adversarial and the Panel Members "do not conduct any hearings, interview or speak with any witnesses, nor do they speak with or meet the applicant." Dkt. No. 68 at ¶¶ 33-34. However, Defendants dispute paragraph 32 of Plaintiff's statement of material facts, which states that, "[i]n making determinations, the Panel [M]embers only review the documents submitted by applicants." *Id.* at ¶ 32. Although the parties' statements of material fact address some of the factual issues relevant to a quasi-judicial immunity determination, the relevant regulations and deposition testimony of the Panel Members are far more pertinent to determining whether immunity attaches to the functions performed. The Court finds no genuine issues of material fact which must be tried before the Court can determine whether the Panel Members are entitled to quasi-judicial immunity as a matter of law.

---

currently presented, it is not clear from the four corners of the proposed amended complaint or [D]efendants' opposition that the defendant panel members are entitled to quasi-judicial immunity." *See* Dkt. No. 39 at 26. Although Defendants opposed the motion to amend, no objections to the Report-Recommendation & Order were filed, so the Court reviewed Magistrate Judge Evangelista's recommendations merely for clear error. *See* Dkt. No. 40 at 3-4. At the time this Court adopted the Report-Recommendation & Order there was "no case directly on point that assesses whether individuals who make the determination whether an individual is entitled to a certificate of relief . . . are entitled to quasi-judicial immunity." Dkt. No. 39 at 21. A few months later, the district court decision in *Richey* was issued, wherein the court determined that Defendants Lee, Barber, and Trahan were, in fact, entitled to quasi-judicial immunity. *See Richey*, 2025 WL 1836492, at *12-16. Thereafter, two decisions from this District, including one from the undersigned, reached the same conclusion. *See Briseno*, 2026 WL 799655, at *8-10; *K.I.*, 2026 WL 571301, at *10-13. Given the evolution of the case law and the current procedural posture of the present matter, the Court stands in a different position now in considering whether the Panel Member are entitled to quasi-judicial immunity.

The certificate of relief process involves the review of extensive evidentiary material. The evidence reviewed by the Panel Members includes an applicant's sworn responses to questions on the request for relief form, certified criminal and medical records, and notarized documentary "evidence of the applicant's reputation." 14 N.Y.C.R.R. § 543.5(a)(2), (a)(3). These documents resemble the sort of evidence proffered in a traditional judicial proceeding.

Moreover, individuals apply for a certificate of relief in accordance with a clearly defined process which contains numerous safeguards. Although 14 N.Y.C.R.R. § 543.5 requires submission of certain evidentiary material, applicants may also voluntarily submit a psychiatric evaluation in support of their application. *Id.* § 543.5(a)(4). Applicants are also permitted to demonstrate their entitlement to relief by submitting affidavits; notarized letters from family, friends, and employers; or any other evidence of their character or reputation. *Id.* § 543.5(a)(3)(iv). The Panel Members must evaluate the evidence under a legal standard: "whether the applicant will not be likely to act in a manner dangerous to public safety and granting the relief will not be contrary to the public interest." *Id.* § 543.5(b)(3). As such, the regulations inform applicants that, to decide whether relief will be granted under the requisite standard, the Panel Members will review evidence concerning their past and present mental health, as well as the circumstances surrounding the disqualifying event. *See id.* § 543.5(a)(3), (a)(4), (a)(5), (a)(7).

After conducting the requisite review, the Panel Members are required to prepare a written determination which must include: (1) "a summary of the information utilized in reaching the decision"; (2) "a summary of the applicant's criminal history (if any)"; (3) "a summary of the psychiatric evaluation prepared to support the request for relief (if any)"; (4) "a summary of the applicant's mental health history"; (5) "a summary of the circumstances surrounding the firearms disability imposed by 18 U.S.C. section 922(d)(4) and (g)(4)"; (6) "an opinion as to whether or

not the applicant's record and reputation are such that the applicant will or will not be likely to act in a manner dangerous to public safety and whether or not the granting of the relief would be contrary to the public interest"; and (7) "a determination as to whether or not the relief is granted." *Id.* § 543.5(c)(1)

If an application for a certificate of relief is granted, OMH implements an update to the federal NICS database to so-indicate. *See id.* § 543.5(c)(2)(i). A granted application removes the federal law disqualification from firearms purchase and possession under 18 U.S.C. § 922(d)(4) and (g)(4), as a grant of the certificate of relief means that the "commitment . . . is deemed not to have occurred." 34 U.S.C. § 40915(b). If an application for a certificate of relief is denied, the applicant is informed of his or her right to have the decision reviewed in state court, and is advised that he or she may not "apply again for a request for relief until a year after the date of the written determination to deny the relief requested." 14 N.Y.C.R.R. § 543.5(c)(2)(ii).

The Panel Members' deposition testimony regarding their duties in rendering a determination are consistent with these regulatory requirements. For example, Defendant Lee testified that 14 N.Y.C.R.R. § 543.5 sets forth the process required and the criteria utilized in determining whether an individual should be granted a certificate of relief. *See* Dkt. No. 59-3 at 69-71. Defendant Lee also testified that, in conducting her duties as a Panel Member, she reviews the relevant documents to assess "what kind of dangerousness was a concern at the time of hospitalization or at other points in time"; "[w]hat kinds of factors contributed to that situation or increase those considerations of risk"; "what the [applicant] might have done after hospitalization to address those underlying issues or concerns"; as well as the applicant's "current functioning" and "ability to understand what went on, and how they might manage things more appropriately

or safely in the future should they find themselves in a stressful situation that they[] [are] having trouble managing." *Id.* at 69-70.

Defendants Barber and Trahan both testified regarding the individualized assessment undertaken in reviewing each application; the review is "fact dependent" and case specific. Dkt. No. 59-4 at 28-29; *see* No. 59-5 at 49-52. The Panel Members review all the submitted materials to determine "what next steps need to be taken[,]" such as follow-up letters to request more information to gain additional context or sending the applicant to an evaluation. *See* Dkt. No. 59-4 at 28. Defendant Barber also testified that his personal role involves providing a legal perspective, which includes review of relevant legal standards and statutes in order to ensure that every applicant is treated equally under the law. *See id.* at 38.

Plaintiff's argument that the Panel Members are not entitled to absolute immunity is grounded in his assertions that: (1) the Panel Members maintain other employment outside of their duties on the ONA panel; (2) the proceedings are less formal than courtroom proceedings; (3) the application process is not an adversarial proceeding; and (4) there is not an "internal appeal process." Dkt. No. 62-9 at 31-36. In essence, Plaintiff's theory is that, because the Panel Members do not conduct their proceedings in open court with live witnesses, absolute immunity cannot shield them from individual § 1983 liability. *See id.* However, none of Plaintiff's arguments persuade. Quasi-judicial immunity is not concerned with whether an individual's duties are conducted in a forum identical to a courtroom; the Court must look at the duties and responsibilities attendant to the function being performed.

Similar to the plaintiff in *Richey*, Plaintiff "cites no authority for the proposition that quasi-judicial immunity applies only to those who work full-time in a quasi-judicial capacity." *Richey v. Sullivan*, No. 1:23-CV-344, 2025 WL 3022472, *6 (N.D.N.Y. Oct. 29, 2025) (denying

motion for reconsideration). And "the fact that a proceeding is conducted *ex parte* has no bearing on whether it is judicial in nature." *Id.* (citing *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 123 (2d Cir. 2020), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)). Indeed, as the Second Circuit has held, "a determination as to whether a proceeding is judicial in nature [does not] depend on the formality or informality with [which] it was conducted, or on whether the proceeding was adversary or *ex parte*." *Libertarian Party*, 970 F.3d at 123 (citing *Stump v. Sparkman*, 435 U.S. 349, 363 & n.12 (1978)). Defendant Barber's testimony that the Panel Members ensure that all applicants are treated equally also suggests that the precedent set by prior determinations is important to the evaluation of subsequent applications. And, the availability of an Article 78 proceeding to challenge allegedly arbitrary decisions provides additional "safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct" and "the correctability of error on appeal." *Cleavinger*, 474 U.S. at 202.[8]

Analogous to a "hearing examiner or administrative law judge[,]" the Panel Members are "administrative officials performing functions closely associated with the judicial process" because their role "is functionally comparable to that of a judge." *Montero*, 171 F.3d at 760

---

[8] Plaintiff's argument that the Panel Members should be subjected to personal liability in federal § 1983 actions because constitutional challenges cannot be raised in Article 78 proceedings is without merit. *See* Dkt. No. 62-9 at 34. Litigants have, in fact, successfully utilized Article 78 proceedings to bring Second Amendment challenges of the denial of pistol permit applications in some circumstances. *See, e.g.*, *Matter of Diperna-Gillen v. Ryba*, 215 A.D.3d 1193, 1194 (3d Dep't 2023); *Matter of Callahan v. City of New York*, 208 A.D.3d 422, 423 (1st Dep't 2022). "When a plaintiff brings an Article 78 proceeding for review of an administrative action and seeks to include a facial constitutional challenge, the state court can convert the proceeding to a hybrid Article 78/declaratory judgment proceeding in which it can adjudicate facial constitutional challenges." *216 E. 29th St. Tr. v. City of N.Y.*, No. 25-465-CV, 2025 WL 3264312, *3 (2d Cir. Nov. 24, 2025) (summary order). "Indeed, the New York state courts regularly do so." *Id.* (collecting cases).

(quoting *Butz*, 438 U.S. at 513) (internal quotation marks omitted). Indeed, similar to the parole board officials in *Montero*, if the Panel Members, "like judges, were to fear adverse consequences from their . . . decisions, they would experience great difficulty in rendering impartial decisions, a responsibility essential to the proper functioning of the [certificate of relief process]." *Id.* (citation omitted).[9] Moreover, similar to parole board officials and judges, absent absolute immunity, the Panel Members "may find themselves spending an inordinate amount of time and expense defending against baseless suits brought by disappointed [applicants], thereby distracting [the Panel Members] from their crucial duties in administering the state's [certificate of relief program]." *Id.* at 761 (citation omitted).

The Second Circuit has likewise held that decisions regarding applications for pistol permits and decisions by a state medical review board to revoke the license of a physician are judicial in character. *See Libertarian Party*, 970 F.3d at 124-25; *Applewhite v. Briber*, 506 F.3d 181, 182 (2d Cir. 2007). Here too, the Panel Members perform an adjudicatory role.

In sum, consideration of the *Cleavinger* factors, and utilization of a functional analysis of the Panel Members' duties, compels the conclusion that quasi-judicial immunity is appropriate. Accordingly, the Court finds Defendants are entitled to summary judgment on Plaintiff's § 1983 claims for money damages on the basis of quasi-judicial immunity.[10]

---

[9] Notably, Defendant Trahan testified regarding actual threats received by the Panel Members from applicants. *See* Dkt. No. 59-5 at 40-42.

[10] As the only claims before the Court at this juncture (Plaintiff's § 1983 claims for money damages against the Panel Members) are subject to dismissal on quasi-judicial immunity grounds, the Court need not, and does not, reach the parties' remaining arguments, including whether collateral estoppel bars relitigating the Panel Members' denial of Plaintiff's 2020 application or whether the Panel Members would be entitled to qualified immunity. For the same reason, Plaintiff's cross-motion, which seeks summary judgment on the merits of his claims, must be denied.

## IV. CONCLUSION

After careful review of the entire record in this matter, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment (Dkt. No. 62) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk of the Court is respectfully directed to close this case.

**IT IS SO ORDERED.**

Dated: September 3, 2026
Albany, New York

Mae A. D'Agostino
U.S. District Judge